UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

QUINN A. JAMES,

                    Petitioner,              Case No. 1:23-cv-308

v.                                    Honorable Robert J. Jonker

BRYAN MORRISON,

                    Respondent.

_____/

### OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Quinn A. James is incarcerated with the Michigan Department of Corrections at the G. Robert Cotton Correctional Facility in Jackson, Jackson County, Michigan. On February 28, 2019, following a five-day jury trial in the Kent County Circuit Court, Petitioner was convicted of first-degree murder, in violation of Mich. Comp. Laws § 750.316, under two theories: premeditated murder and felony murder. Petitioner was also convicted of conspiracy to commit first-degree murder, also in violation of Mich. Comp. Laws § 750.316. On April 15, 2019, the court sentenced Petitioner as a third habitual offender, Mich. Comp. Laws § 769.11, to life imprisonment without the possibility of parole.

On March 21, 2023, Petitioner filed his habeas corpus petition raising three grounds for relief, as follows:

    I.       The Michigan Court of Appeals' adjudication of Petitioner's insufficiency of evidence claim and denial of trial counsel's motion for directed verdict was based upon an unreasonable determination of the facts and an unreasonable application of clearly established federal law.

II.     The state trial court erred by admitting prejudicial other-acts testimony from witness Dequarius Bibbs that was completely unmoored from the prosecution's theory of logical relevance. The Michigan Court of Appeals' decision was based upon an unreasonable determination of the facts and legal decision was contrary to clearly established federal law. To the extent trial counsel's objection was insufficiently specific, counsel was constitutionally ineffective.

III.    The state trial court violated Petitioner's constitutional right to present a defense by excluding relevant evidence regarding a prior sexual relationship between the Petitioner and an employee of the Kent County Prosecutor's office. The Michigan Court of Appeals' decision was based upon an unreasonable determination of the facts and ultimately contrary to clearly established federal law.

(Pet'r's Br., ECF No. 2, PageID.11–12.) Respondent contends that Petitioner's grounds for relief are meritless. (ECF No. 6.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

## I.     Factual Allegations

The Michigan Court of Appeals' recitation of the facts underlying Petitioner's convictions is lengthy. The Court, therefore, will summarize the pertinent facts from the court of appeals' opinion.

Sixteen-year-old Mujey Dumbuya left her home on January 24, 2018. *See People v. James*, No. 348886, 2020 WL 5495286, at *1 (Mich. Ct. App. Sept. 10, 2020). Dumbuya generally walked to a nearby bus stop to go to school, but that day, "she did not get on the bus or go to school." *Id.* The next day, her family called the Grand Rapids Police Department to report Dumbuya as missing. *Id.* The police report classified Dumbuya as a runaway, as there was evidence that Dumbuya had told a friend that she was going to run away or go "MIA" for a while, and because Dumbuya had told her ex-boyfriend, Daquarius Bibbs, that she was planning to run away. *Id.* n.2.

Three days later, on January 28, 2018, two students discovered a girl's body in a wooded area in Kalamazoo, Michigan. *Id.* at *1. They called 911, and police officers responded. *Id.*

> From the walking path, the responding police officers could not tell it was a body, but when they got closer it was apparent that it was a girl and she was deceased. The girl was wearing only one pink shoe, and there was a blue plastic cap on her arm. Her blue jeans were pulled to her knees, her underwear were not secured to her hips, and her coat looked as if it had been pulled over her head. Some of the officers described smelling a chlorine-based product, and the girl's clothing— which was streaky and appeared discolored by a bleach-like substance—was damp.
>
> On January 29, 2018, an autopsy was performed. The forensic pathologist testified that the girl's body was partially frozen, but there was no way to determine how long her body had been in the woods. The forensic pathologist opined that the cause of death was asphyxia including strangulation. The girl did not have any identification and the police were unable to identify her by her fingerprints. Because there was a Grand Rapids Rapid Bus pass on the body, the Kalamazoo police called the Grand Rapids police. Based on the description of the body, the Grand Rapids police suspected that the girl might be Dumbuya. Using Dumbuya's dental records the[] police were able to positively identify the body as Dumbuya.

*Id.*

Two days after Dumbuya's body was found, the police were already investigating "the possibility that [Petitioner] was involved in Dumbuya's murder." *See id.* at *2. At the time of the murder, James was pending trial on four counts of third-degree criminal sexual conduct (CSC-III), based upon "Dumbuya's November 2017 disclosure that between July 2017 and September 2017, when she was 15 years old, [Petitioner] had sexually assaulted her on a number of occasions." *Id.* James had admitted that he had sex with Dumbuya on two occasions when her ex-boyfriend, Bibbs, was present. *Id.* "[Petitioner] maintained that the encounters were consensual, [but] Bibbs testified that Dumbuya had not consented to having sex with [Petitioner]." *Id.*

While incarcerated on the CSC-III charges, Petitioner twice told Lenard Conyers, an inmate at the Kent County Jail, "that he was not going to let the girl testifying against him get on the stand." *Id.* Petitioner asked Conyers "if he knew anyone in Detroit, but Conyers told him that

3

he did not." *Id.* Petitioner told Conyers that "he would get in touch with some guys he knew in Detroit to see if they 'knew somebody that would not let her get on the stand.'" *Id.*

At some point in November of 2017, Petitioner had been released on bond for the CSC-III charges. *Id.* His preliminary hearing for those charges was scheduled for November 30, 2017. *Id.*

> One day earlier, a Grand Rapids city bus driver noticed something unusual on her morning route. The driver described a "vehicle that was acting differently," keeping up with her, going away from her, going in front of her, and then waiting for her to pass. The driver's route typically started at 5:30 a.m. and she would arrive at the stop near Dumbuya's apartment building close to 6:00 a.m., Dumbuya would "quite often" get on the bus, and she would get off at the stop near her school. The unusual vehicle incident started immediately after Dumbuya boarded the bus on November 29, 2017. At 8:04 a.m., the bus driver posted on Facebook what she had seen, noting that the vehicle in question was a silver GMC Acadia with the license plate DGU6067. During their investigation, the police learned at that time James had possession of a loaner car from the Todd Wenzel dealership that had the same make, model, and license plate number as the vehicle following Dumbuya's bus.

*Id.*

While on bond, Petitioner had several conversations with others concerning the CSC-III charges and Dumbuya. *Id.* For example, during one conversation, Petitioner stated that he "hoped that Dumbuya would go on vacation and her plane would crash." *Id.* In another conversation, Petitioner asked a woman in Kalamazoo "where he could get a gun for protection from a 'cousin' who was accusing him of some things." *Id.* Ultimately,

> James later obtained a gun from Daren Eckford. Eckford testified that in near Christmas of December 2017, James visited him in Detroit so that he could purchase a gun. Eckford sold James a .30 caliber rifle. Eckford explained that James told him that he "needed to take care of some business" because a young man had set him up on rape allegations and "had the girl lying on him." Eckford described James as emotional, saying that he did not want to get locked up and repeating that the girl was lying. Later, over the phone, James told him that the gun was too loud. James asked Eckford to come to Grand Rapids to help him take care of the problem with the rape, but Eckford declined.

> Eckford testified that James asked him to help find someone to "take care of that," so he referred him to Gerald "Roach" Bennett. He recounted telling Bennett that "my man needs something took care of" and that Bennett was "cool" with that. In a text message sent to James on January 3, 2018, Eckford wrote "got somebody."

James responded, "Oh, hold on." Eckford texted back, "My bad, call Roach." James then asked, "Is this nigga the feds?" Eckford answered, "No."

*Id.* at *2–3.

In January of 2018, Petitioner picked Bennett up in Detroit. *Id.* at *3. Analysis showed that Petitioner's and Bennett's phones were in the Grand Rapids area on January 21, 2018. *Id.* Moreover, Bennett's girlfriend received a $125.00 wire transfer from Petitioner on January 23, 2018. *Id.* Cell phone analysis also indicated that Petitioner's phone was near Dumbuya's apartment around midnight on January 23, 2018, "and Bennett's phone was in the same general area less than an hour after midnight on January 24, 2018." *Id.*

Although there was no location information for the cell phones between 7:40 a.m. and 9:09 a.m. on January 24, 2018, there was evidence "showing that [Petitioner and Bennett] drove to Kalamazoo in a black 2018 GMC Acadia, dumped Dumbuya's body by 8:42 a.m., and then drove to a Grand Rapids car wash." *Id.* From January 19, 2018, until January 24, 2018, Petitioner "had possession of a black 2018 GMC Acadia that he had received as a loaner vehicle from the Todd Wenzel dealership." *Id.* Police located Dumbuya's DNA in the third-row back seat of that vehicle. *Id.* A dealership employee "testified that a middle-aged man was with [Petitioner] when he returned the vehicle" on January 24, 2018. *Id.*

Forensic evidence also linked Petitioner to Dumbuya's murder. *Id.* at *4. Specifically, a forensic scientist testified that, based on her analysis of the DNA mixture on Dumbuya's blue jeans, it was "at least 79 million times more likely to be explained as a mixture from [Dumbuya], James, and two unrelated, unknown individuals than" it was to be a mixture from Dumbuya and three unknown individuals. *Id.* She explained that "this analysis provides very strong support that Quinn James is a contributor to the DNA typing results obtained from the swab of the blue jeans"

and she concluded that James was a contributor to the DNA profiles contained on the blue jeans. *Id.*

Before the discovery of Dumbuya's body on January 28, 2018, Petitioner had made a "number of statements suggesting that the CSC case had been resolved." *Id.* For example, on January 25, 2018, he told the woman in Kalamazoo that "he was fine and that the 'situation had been worked out.'" *Id.* Moreover,

> [o]n January 28, at 10:00 a.m., the mother of James's twins asked him whether the CSC case had been dropped yet. In response, James said, "[Dumbuya] told them that I didn't do anything to her and that she was pressured by [Bibbs] to say that. It hasn't been dropped yet, but will be on the next court date." She texted back, "That's good she told the truth," and she added, "Now will they do anything to her for false statements or whatever it's called." James responded "I was so happy when my lawyer called and showed me her statement," and he also said, "Yes, she's getting three . . . charges." The twins's mother opined that "[Bibbs] should get charged too." James answered: "[Dumbuya] said [she] had a dream about his kids. He's a good father and was always nice to everyone. He didn't deserve this. His kids don't deserve it. Her mom called me and apologized." He also stated, "[Bibbs is] going to get away with nothing" and that "I learned a valuable lesson for real. Couldn't imagine my kids growing up without me. I'll never be in that situation again." In contrast, the officer in charge of the CSC case testified that Dumbuya never approached her about dropping the charges and Dumbuya's family never indicated anything like that either.

*Id.*

Shortly thereafter, in February of 2018, Petitioner "was arrested and charged with an unrelated CSC from 2014." *Id.* at *5. The complainant from that case "testified as a 404(b) witness." *Id.* She testified that "[Petitioner] choked her and forced her to have sex with him in his bedroom." *Id.* After, "[Petitioner] threatened to kill her, wrap her body in a blanket, and pour bleach on her body to destroy forensic evidence." *Id.*

Petitioner was back in jail as of February 3, 2018, when he told his then-girlfriend, Tiara Burnett, that he wanted her to "write down his 'comings and goings' for January 24, 2018." *Id.* During that call, Petitioner told Burnett that he had gone to the car wash in the morning, but then

paused and said, "oh, no, no, no, I didn't go to Mister Car Wash." *Id.* Later in the same call, however, Petitioner "said he went to the car wash 'later' in the day." *Id.* Petitioner also stated that "he dropped his half-sister's children off at school, but his half-sister's testimony and her children's school records reflect that he did not." *Id.*

Jury selection for Petitioner's trial occurred on February 18, 2019. (Trial Tr. I, ECF No. 7-8.) Over the course of five days, the jury heard testimony from numerous witnesses, including law enforcement officers, crime laboratory specialists, Bennett's former girlfriend, Petitioner's girlfriend's brother, and Bibbs. (Trial Tr. II, III, IV, V, VI, & VII, ECF Nos. 7-9, 7-10, 7-11, 7-12, 7-13, 7-14.) The jury began their deliberations at around 2:00 p.m. on February 27, 2019. (Trial Tr. VIII, ECF No. 7-15, PageID.2639.) In the early afternoon of February 28, 2019, the jury reached a guilty verdict.[1] (Trial Tr. IX, ECF No. 7-16, PageID.2656.) Petitioner appeared before the trial court for sentencing on April 15, 2019. (ECF No. 7-17.)

Petitioner, with the assistance of appellate counsel, appealed his convictions and sentences to the Michigan Court of Appeals. In a counseled brief, Petitioner raises what he now asserts as habeas grounds II and III. (ECF No. 7-24, PageID.3090.) In a *pro per* supplemental brief, Petitioner raised the following claims for relief: (1) there was insufficient evidence to convict him; (2) the trial court abused its discretion by denying his motion for directed verdict of acquittal; and (3) the prosecution engaged in prosecutorial misconduct during closing arguments by suggesting

---

[1] Petitioner was also convicted of the four CSC-III counts premised upon Dumbuya's statement. The Michigan Court of Appeals affirmed those convictions, *see People v. James*, No. 346983, 2020 WL 5495204, at *1 (Mich. Ct. App. Sept. 10, 2020), and the Michigan Supreme Court denied Petitioner's application for leave to appeal, *see People v. James*, 954 N.W.2d 824 (Mich. 2021). Petitioner subsequently filed a § 2254 petition challenging the CSC-III convictions, which this Court dismissed. *See James v. Minard*, No. 1:21-cv-348, 2021 WL 1811511 (W.D. Mich. May 6, 2021). The United States Court of Appeals for the Sixth Circuit denied a certificate of appealability. *See James v. Minard*, No. 21-1547, 2021 WL 8697838 (6th Cir. Dec. 7, 2021).

facts not in evidence. (ECF No. 7-24, PageID.3163. The court of appeals affirmed Petitioner's convictions and sentences on September 10, 2020. *See James*, 2020 WL 5495286, at *1. The Michigan Supreme Court denied Petitioner's counseled application for leave to appeal on March 2, 2021. *See People v. James*, 954 N.W.2d 807 (Mich. 2021).

Petitioner then returned to the trial court and filed a motion for relief from judgment pursuant to Michigan Court Rule 6.500. (ECF No. 7-18.) Petitioner asserted several claims of error in that motion, none of which he now raises in his § 2254 petition. The trial court denied Petitioner's Rule 6.500 motion in an opinion and order entered on December 10, 2021. (ECF No. 7-20.) The court of appeals denied Petitioner's application for leave to appeal on November 14, 2022. (ECF No. 7-25, PageID.3226.) Petitioner's application for leave to appeal to the Michigan Supreme Court was "rejected on January 19, 2023, as being submitted beyond the filing deadline." (ECF No. 7-27, PageID.3557.) This § 2254 petition followed.

## II.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020)

(internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

"[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d

433, 436 (6th Cir. 2003)).

## III.  Discussion

### A.  Ground I—Sufficiency of the Evidence

As his first ground for relief, Petitioner contends that his convictions were not supported by sufficient evidence. (Pet'r's Br., ECF No. 2, PageID.38.) Petitioner argues that the prosecution did not present sufficient evidence for the jury to "conclude beyond a reasonable doubt that Petitioner conspired to kidnap and kill the victim." (*Id.*) Petitioner avers further that the court of appeals' rejection of his sufficiency of the evidence claim was based upon an unreasonable determination of the facts. (*Id.*, PageID.39.)[2]

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court announced the following standard for resolving sufficiency claims: the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only examine the evidence supporting the conviction, in the light most

---

[2] Petitioner also faults the trial court for denying his motion for a directed verdict. (Pet'r's Br., ECF No. 2, PageID.54.) Although the standards for granting a directed verdict and finding the evidence was constitutionally insufficient might be similar, whether the trial court should have entered a directed verdict is purely an issue of state law and is not cognizable on habeas review. *See, e.g., King v. Trippet*, 27 F. App'x 506, 510 (6th Cir. 2001) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)); *Holloway v. Palmer*, No. 16-2450, 2017 WL 4844457, at *3 (6th Cir. Apr. 5, 2017) (citing *King*).

favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals applied the following standard to resolve Petitioner's sufficiency challenge: "Due process requires, that when the evidence is viewed in the light most favorable to the prosecution, a reasonable trier of fact could find each element of the crime established beyond a reasonable doubt." *James*, 2020 WL 5495286, at *5 (citing *People v. Lundy*, 467 Mich. 254, 257, 650 N.W.2d 332 (2002)). Although the court of appeals cited state authority as the source of the standard, the case cited within *Lundy* identifies *Jackson* as the source. *See People v. Wolfe*, 489 N.W.2d 748, 751 (Mich. 1992).

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

12

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard—here *Jackson* rather than *Strickland*—Petitioner can only overcome the deference afforded state court decisions if the court of appeals' conclusion regarding the sufficiency of the evidence is an unreasonable application of *Jackson* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

The court of appeals noted that Petitioner "was convicted of first-degree murder under two theories: premeditated murder and felony murder." *James*, 2020 WL 5495286, at *5. The court of appeals set forth the elements of first-degree premeditated murder, first-degree felony murder, and unlawful imprisonment, as the prosecution alleged that Petitioner killed Dumbuya while committing that felony. *See id.* The court of appeals also set forth the elements necessary to determine whether someone aided or abetted the commission of a crime. *See id.* at *6.

The court of appeals then applied the *Jackson* standard as follows to conclude that the prosecution had introduced sufficient evidence to convict Petitioner of first-degree murder:

While in jail on the CSC charges relating to Dumbuya, James told another inmate that he was going to contact someone in Detroit to help him make sure Dumbuya did not testify against him. When he was released on bond, he followed Dumbuya's bus from her apartment to her school. He then contacted Eckford and bought a gun before deciding it was too loud. He asked Eckford to come to Grand Rapids to take care of the problem and when Eckford declined, he asked for a referral to someone who could help him. Eckford referred James to Bennett. Because Bennett's girlfriend received $125 from James and James gave Bennett a vehicle after the murder, the jury could reasonably infer that Bennett was paid to help James.

The week of the murder, James texted the mother of his twins, asking her to care for them that week in his stead. He travelled to Detroit to pick up Bennett and take him to Grand Rapids. The night before Dumbuya's disappearance James's and Bennett's phones were in the vicinity of her apartment complex. The next morning, Bennett's phone was in the vicinity of Dumbuya's bus stop. Although Dumbuya normally would board the bus at approximately 6:00 a.m., she did not board the bus on January 24, 2018. At trial, the defense theory was that she did not get on the bus because—consistent with statements she made to at least two people—she ran away. However, the night before her disappearance, she said they planned on running away after school. In addition, when located, her backpack contained school items, including text books and school binders, which allows for an inference that she did, in fact, plan on going to school the day she disappeared.

Dumbuya's body was dumped in Kalamazoo. The cause of death was asphyxia including strangulation. Her clothes were streaked with bleach and she had no identification on her body. There was evidence that, in 2014, in response to a possible rape charge, James threatened to kill his accuser and use bleach to conceal forensic evidence that might be located on her body. That allows for an inference that James attempted to conceal forensic evidence by pouring bleach on Dumbuya's body or aiding and abetting Bennett. Either way, James's DNA was located on Dumbuya's blue jeans, and Dumbuya's DNA was located in the back seat of a black 2018 GMC Acadia that James had borrowed from the Todd Wenzel dealership. The DNA link is strong evidence identifying James as one of the people involved in Dumbuya's abduction and murder.

The black GMC Acadia was photographed by trail cams while it was driving back and forth near where Dumbuya's body was dumped. Although the license plate number was not visible, the jury could reasonably infer it was the vehicle in James's possession because Dumbuya's DNA was found inside that vehicle. Dumbuya's backpack was also found on US-131 between Grand Rapids and Kalamazoo, suggesting that someone threw it out the window of a vehicle traveling that route. James and Bennett's cellular phone location data indicates that they were traveling along US-131 toward Grand Rapids after the body was dumped in Kalamazoo. Approximately 50 minutes after Dumbuya's body was dumped in Kalamazoo, James was captured on the surveillance video at a Mister Car Wash in Grand Rapids. The police testimony established that the trip would take approximately 44

minutes to travel from the dump sit[e] to the car wash if James was driving 5 miles over the posted speed limit.

James and Bennett returned the vehicle used to dump Dumbuya's body to the dealership. Bennett returned to Detroit. And James, before Dumbuya's body was located, began telling numerous people that the CSC case against him had been resolved and the charges were going to be dropped. When Dumbuya's body was discovered and after he knew he was a suspect in her death, James asked Burnett to write down his whereabouts on January 24, 2018 while they were "fresh" in his head. The police were able to confirm that while telling Burnett where he had been on January 24, 2018, James made multiple false statements, including a claim that he was not at the car wash in the morning and a claim that he dropped off his half-sister's children at school.

Viewing the foregoing evidence in the light most favorable to the jury's verdict, there was overwhelming evidence that James either directly killed Dumbuya after planning her murder or that he aided and abetted Bennett's killing of Dumbuya. Moreover, although he argues on appeal that the evidence in insufficient because no one saw anyone actually "kidnap" Dumbuya, the circumstantial evidence shows that between 6:00 a.m. and 8:42 a.m., Dumbuya was confined by James or he aided and abetted Bennett in confining her. Her DNA was in James's rental vehicle (which he rented for the first time in January 2018) and his DNA was on her blue jeans despite the fact that she had no contact with him since November 2017.

*James*, 2020 WL 5495286, at *6–7.

Petitioner also challenged his conviction for conspiracy to commit first-degree murder. The court of appeals first set forth the elements required to prove criminal conspiracy. *See id.* at *7. The court of appeals concluded that there was sufficient evidence to support Petitioner's conspiracy conviction, stating:

James notes that there is no evidence of a direct conversation between him and Bennett where they agreed to kill Dumbuya. Direct evidence, however, is unnecessary. *See id.* ("Direct proof of a conspiracy is not required; rather, proof may be derived from the circumstances, acts, and conduct of the parties."). Here, when viewed in the light most favorable to the jury's verdict, the evidence shows that James wanted to find someone in Detroit to prevent Dumbuya from testifying. He initially asked Eckford to come to *Grand Rapids* to help his deal with his CSC problem. That is significant because Dumbuya lived in Grand Rapids, whereas the "guy" James spoke about with Eckford lived in Saginaw. When Eckford refused to help, he referred James to Bennett as someone who knew the "streets" and would be "cool" with helping James kill someone. After hiring Bennett, James and Bennett worked in concert to effectuate the commission of a murder. They traveled from Detroit to Grand Rapids and scouted Dumbuya's apartment complex the night

> before her disappearance. Then, after dumping her body in Kalamazoo, they travelled together to a car wash in Grand Rapids. Later, they both returned the loaner vehicle with Dumbuya's DNA in the back seat. Bennett received the second half of his payment for helping James. Taken together, the actions of James and Bennett allow for a reasonable inference that thy [*sic*] formed an unlawful agreement with the specific intent of killing Dumbuya.

*Id.* Finally, the court of appeals concluded that the trial court did not err by denying Petitioner's motion for a directed verdict because, "in light of the above evidence, it is clear that there was sufficient evidence to send the charges to the jury." *Id.* at *8.

To prevail on his sufficiency claim now, Petitioner must show that the inferences urged by the appellate court are unreasonable. Notably, "[t]he facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016). Petitioner can overcome that presumption with clear and convincing evidence. As discussed below, even though Petitioner challenges some of the facts recited by the court of appeals, he fails to present any evidence to suggest that those determinations are unreasonable on the record.

In *Coleman v. Johnson*, 566 U.S. 650, 655 (2012), the Supreme Court provided some guidance with respect to the distinction between a reasonable inference and mere speculation. Based on the Court's analysis, a reasonable inference is an inference that a rational factfinder could make from the facts. That is hardly an earth-shattering revelation, and it is not a particularly onerous burden. The Court went so far as to say, "the only question under *Jackson* is whether [a] finding is so insupportable as to fall below the threshold of bare rationality." *Id.* at 656.

Petitioner first faults the court of appeals for relying upon testimony given by another inmate that Petitioner told that inmate "that he was going to contact someone in Detroit to help him make sure Dumbuya did not testify against him." (Pet'r's Br., ECF No. 2, PageID.39.) Petitioner argues: "Obviously, the panel is relying on the testimony of Lenard Conyers, who is a

self-proclaimed drug addict who previously gave false information to police." (*Id.*, PageID.40.) Petitioner "believes this viewing Court should find it highly improbable that he would share such damaging information [with] a complete stranger." (*Id.*) Petitioner essentially invites this Court to reweigh Conyers' credibility. However, it is up to the jury to decide issues of credibility and draw inferences—so long as those inferences are reasonable. *See Herrera*, 506 U.S. at 401–02; *Martin*, 280 F.3d at 618. Petitioner's invitation turns the *Jackson* standard on its head.

Petitioner also asserts that, contrary to the court of appeals' statement, the bus driver never testified that Petitioner was the individual who was following the bus. (Pet'r's Br., ECF No. 2, PageID.40.) After reviewing the bus driver's testimony, the Court agrees with Petitioner that the bus driver never identified Petitioner by name. The bus driver, however, did provide testimony regarding the license plate on the car that caused concern. (Trial Tr. IV, ECF No. 7-11, PageID.1726.) As the court of appeals noted, that license plate matched the license plate of the loaner car that Petitioner had possession of during the relevant time. Thus, it was reasonable for the court of appeals to state that Petitioner was the one who was following Dumbuya's bus.

Petitioner also faults the court of appeals for relying upon testimony from Eckford that Eckford agreed to sell Petitioner a gun and introduce him to Bennett. (Pet'r's Br., ECF No. 2, PageID.41.) Petitioner argues that this testimony "was completely inconsistent with the manner of death to the victim," and that this "begs the question as to why testimony from Eckford was introduced saying Petitioner wanted a gun to kill the victim." (*Id.*) While Petitioner is correct that Dumbuya was not murdered by a firearm, such testimony is relevant to an inference that Petitioner was considering ways to murder Dumbuya to prevent her from testifying regarding the CSC-III charges.

Petitioner also takes issue with the court of appeals' reliance on testimony that Petitioner "paid Bennett to kill Dumbuya by giving his girlfriend $125 and gave him a vehicle after the murder." (Pet'r's Br., ECF No. 2, PageID.41.) Petitioner asserts that there "was no evidence presented that Bennett had ever participated in this crime or had any prior experience that would make him cold-hearted enough to commit first degree murder." (*Id.*) Petitioner argues further that "[n]ot one shred of evidence was introduced by the prosecution showing any phone calls, texts[,] or emails between Petitioner and Bennett during this incident." (*Id.*) Petitioner, however, overlooks the fact that "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006); *see also Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008) (noting that "[a] conviction may be sustained based on nothing more than circumstantial evidence"). The Supreme Court has noted that "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (quotation omitted). For Petitioner to suggest that there would have been direct evidence in the form of calls, texts, or emails between him and Bennett explicitly setting forth a conspiracy to kill Dumbuya simply strains credulity. Petitioner fails to show that the court of appeals' reliance upon this circumstantial evidence to uphold Petitioner's conspiracy conviction is not premised upon reasonable inferences.

Petitioner also faults the court of appeals for omitting certain facts from its sufficiency analysis. For example, Petitioner argues that the court of appeals "subjectively reviewed the state court record and failed to take into consideration that Dumbuya's backpack contained a sports bra and purse." (Pet'r's Br., ECF No. 2, PageID.42.) Petitioner suggests the presence of these items could lead to a conclusion that Dumbuya was not planning on going to school on the day she was

kidnapped. (*Id.*) Petitioner also faults the court of appeals for omitting the following facts: (1) the DNA sample could not be retested because no material was left for additional testing; (2) there was no blood in Dumbuya's mouth or any other visible area of her body; (3) "other favorable evidence of DNA found under Dumbuya's fingernails did not match Petitioner or Bennett's DNA"; and (4) Dumbuya's body was found wearing one pink shoe, and Dumbuya's mother had told the police that her daughter had been wearing a grey coat and brown boots when she disappeared. (*Id.*, PageID.43.) Petitioner contends that by omitting these facts, the court of appeals "failed to consider any facts favorable to Petitioner during the appeal proceeding." (*Id.*, PageID.44.) As set forth above, however, that turns the *Jackson* standard on its head. Under *Jackson*, a reviewing court is required to view the evidence "in the light most favorable to the **prosecution**" to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

Petitioner has offered nothing from which this Court could conclude that the court of appeals' inferences were irrational and unreasonable. Certainly, one could interpret the underlying events differently and reach the opposite conclusions, but that does not render the court of appeals' conclusions and inferences irrational. Petitioner, therefore, has failed to meet his burden. Moreover, under *Jackson*, a habeas court is not required to sift through the evidence and place it on one side of the scale or the other for the purpose of assessing whether the jurors' estimation of the balance is correct. Instead, the Court is only required to look at the evidence in a light that favors the prosecution and assess whether a rational factfinder could conclude that Petitioner is guilty beyond a reasonable doubt considering that evidence. Upon review of the record, this Court is satisfied that a rational factfinder could so conclude.

In sum, Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support his convictions is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief on habeas ground I.

**B.      Ground II—Admission of Other-Acts Testimony and Ineffective Assistance of Counsel**

In habeas ground II, Petitioner contends that the trial court "erred by admitting highly prejudicial other-acts testimony from witness Daquarius Bibbs that was completely unmoored from the prosecution's theory of logical relevance." (Pet'r's Br., ECF No. 2, PageID.56.) Petitioner also suggests that counsel was ineffective for offering an "insufficiently specific" objection to Bibbs' testimony. (*Id.*)

At Petitioner's trial, Bibbs testified that he was 16 years old when he met Dumbuya. (Trial Tr. VI, ECF No. 7-13, PageID.2276.) Bibbs and Dumbuya met on Facebook during the summer of 2017. (*Id.*, PageID.2277.) Bibbs was living in Grand Rapids with his "auntie," Tiara Burnett, when he first met Dumbuya. (*Id.*, PageID.2278.) Bibbs testified that Petitioner was living with Burnett at the time, and that he considered Petitioner to be like an uncle to him. (*Id.*, PageID.2279.)

Bibbs testified that on one day during the summer of 2017, Petitioner took him to meet Dumbuya at a Buffalo Wild Wings. (*Id.*, PageID.2281.) Bibbs and Dumbuya "went to the woods" near the restaurant, where they had sex. (*Id.*, PageID.2282–2283.) Bibbs then called for a ride, and Petitioner picked them up. (*Id.*, PageID.2285.) Petitioner drove Bibbs and Dumbuya to "a business place," where they went into a parking lot. (*Id.*) Bibbs testified that Petitioner then had sex with Dumbuya in the back seat of the vehicle. (*Id.*) Bibbs was in the back seat as well, and was holding Dumbuya's hand. (*Id.*) Bibbs testified that during the act, Dumbuya was crying, and that they "didn't know what to do at the time" because they "were both scared" and "didn't want that to

happen." (*Id.*, PageID.2286.) Bibbs acknowledged that he did not try to stop Petitioner because he "was just scared" and "shook." (*Id.*, PageID.2288.)

Bibbs testified further that he saw Petitioner have sexual contact with Dumbuya "three more times" after that incident. (*Id.*, PageID.2289.) He noted that these encounters occurred at Petitioner's house, an apartment, and a truck. (*Id.*, PageID.2289–2290.) Bibbs testified that Dumbuya did not consent and "said no," but that "she never really fought [Petitioner] physically." (*Id.*, PageID.2290.) Bibbs tried to discourage Dumbuya from coming over to the house because Petitioner was there. (*Id.*, PageID.2291.) Bibbs and his family also tried to convince Dumbuya to report Petitioner to the police. (*Id.*) Ultimately, Bibbs called the police after telling his auntie everything that had happened. (*Id.*, PageID.2293–2294.)

Petitioner raised his challenge to the admission of Bibbs' testimony on direct appeal, asserting that the trial court's admission of Bibbs' testimony violated Michigan Rule of Evidence 404(b). *James*, 2020 WL 5495286, at *8. The court of appeals rejected Petitioner's arguments, concluding that Bibbs' testimony was introduced "to show that [Petitioner] had a motive to kill Dumbuya," and that "[p]roof of motive is a proper, non-character purpose." *Id.* The court of appeals also noted that "the evidence was relevant to a fact of consequence at [Petitioner's] trial, i.e., whether [Petitioner] killed or aided and abetted Bennett in killing Dumbuya." *Id.* On direct appeal, Petitioner argued that there was no proper purpose for Bibbs' testimony "because other evidence shows that he admitted to having sex with Dumbuya and she disclosed his actions to a school counselor." *Id.* The court of appeals rejected that assertion, finding that Bibbs' testimony was not identical to the probative force of other evidence and that its probative value was not "substantially outweighed by the danger of unfair prejudice." *Id.* at *9. The court of appeals further

noted that even if the trial court abused its discretion, the error was harmless given the overwhelming "untainted evidence of [Petitioner's] guilt." *Id.* at *10.

### 1.   Due Process

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." 502 U.S. at 67–68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. Thus, to the extent that Petitioner asserts that the state courts erred under Michigan law, he fails to state a claim upon which habeas relief may be granted. State courts are the final arbiters of state law, and the federal courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

It is not inconceivable that evidence properly admitted under state law might still have the effect of rendering Petitioner's trial unfair. However, "state-court evidentiary rulings cannot rise to the level of due process violations unless they offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (internal quotation marks omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Further, under the AEDPA, this Court may not grant relief if it would have decided the evidentiary question differently. This Court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court

on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000); *see also Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (stating that, to obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify "a Supreme Court case establishing a due process right with regard to the specific kind of evidence at issue").

Here, Petitioner fails to identify any clearly established Supreme Court precedent that would preclude admission of the prior acts at issue. Indeed, there is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of "other bad acts" evidence. In *Estelle*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. *Estelle*, 502 U.S. at 75. The Court stated in a footnote that because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512.

Thus, because there is no clearly established federal law holding that admission of "prior bad acts" evidence violates due process, Petitioner cannot demonstrate that the state courts' rejection of his claim concerning the admission of Bibbs' testimony regarding Petitioner's other

23

acts is contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to relief with respect to this portion of habeas ground II.

### 2.      Ineffective Assistance of Counsel

Petitioner also argues that "[t]o the extent that this Court finds the claim unpreserved, then Petitioner "contends defense counsel's performance was constitutionally deficient and did prejudice the defense by failing to specifically object to the 404(b) testimony offered by Bibbs." (Pet'r's Br., ECF No. 2, PageID.67.) Although the Court does not conclude that this claim is unpreserved, the Court will briefly address Petitioner's ineffective assistance argument.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

A review of the record indicates that Petitioner's counsel never objected to the admission of Bibbs' testimony. While the court of appeals did not explicitly address the ineffective assistance of counsel aspect of Petitioner's claim, it plainly ruled that the admission of Bibbs' testimony did not violate state law,[3] and it would have been futile for counsel to argue otherwise. "[O]mitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *see also Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."). Accordingly, Petitioner is not entitled to relief with respect to this portion of habeas ground II.

In sum, the admission of Bibbs' testimony did not violate Petitioner's due process rights, and counsel was not ineffective for failing to object to Bibbs' testimony. Petitioner, therefore, is not entitled to relief with respect to habeas ground II.

## C.     Ground III—Right to Present a Defense

As his third and final ground for relief, Petitioner contends that the trial court violated his "constitutional right to present a defense by excluding relevant evidence regarding a prior sexual relationship between Petitioner and an employee of the Kent County Prosecutor's Office." (Pet'r's Br., ECF No. 2, PageID.68.)

Prior to trial, the trial court held an evidentiary hearing regarding Petitioner's motion to recuse the Kent County Prosecutor's Office because of his prior relationship with the employee. At that hearing, Tasha Broy, the employee in question, testified. Ms. Broy testified that she had worked as a victim advocate since April of 2016. (ECF No. 7-6, PageID.725.) She first met

---

[3] Petitioner did not argue that the admission of the other acts evidence violated due process in the Michigan Court of Appeals or the Michigan Supreme Court. (Pet'r's Mich. Ct. App. Br., ECF No. 7-24, PageID.3108–3120; Pet'r's Mich. App. for Leave to Appeal, ECF No 7-26, PageID.3422–3434.)

Petitioner through social media in February of 2017. (*Id.*, PageID.728.) Ms. Broy testified that she and Petitioner dated from March until May of 2017. (*Id.*, PageID.731.) In November of 2017, she learned that Petitioner had been accused of CSC-III when, as part of her job as a victim advocate, she received a police report with his name on it. (*Id.*) Ms. Broy testified that she had sporadic contact with Petitioner between May and November of 2017. (*Id.*, PageID.732.) She did not have any face-to-face contact, but testified that Petitioner would "continue to call or text" her, and that she would respond at times. (*Id.*) Ms. Broy finally asked Petitioner to stop contacting her, and testified that she did so "most certainly" before November of 2017. (*Id.*) She received one final phone call from Petitioner in August of 2017, and "definitely" did not recall any contact with him between August and November of 2017. (*Id.*, PageID.733.)

Ms. Broy testified that she had contact with Dumbuya when she and her family came to the district court for the probable cause hearing regarding Petitioner's CSC-III charges in November of 2017. (*Id.*, PageID.735.) She had no contact with Dumbuya after that hearing. (*Id.*, PageID.737.) Moreover, Ms. Broy informed the relevant parties regarding her prior relationship with Petitioner. (*Id.*, PageID.738–739.) Ms. Broy had no further involvement in the CSC-III matter after it left district court and, therefore, was assigned to another advocate. (*Id.*, PageID.740.) She testified that she also was not involved in any subsequent cases that were filed involving Petitioner. (*Id.*)

At the end of the hearing, the trial court noted that while the prosecutor's office may not have handled the issue of Ms. Broy's prior relationship with Petitioner "perfectly," the office exercised good faith in how it was handed. (*Id.*, PageID.818–819.) The trial court concluded that there was not "a sufficient basis to recuse the prosecuting attorney's office or any of the assistant prosecutors assigned to this case." (*Id.*, PageID.819.) A week later, on September 7, 2018, the trial

court issued a written opinion denying Petitioner's motion to disqualify the prosecutor's office. (ECF No. 7-7.)

On February 18, 2019, before the court conducted jury selection, the trial court itself raised the issue of the admissibility of Petitioner's past relationship with Ms. Broy. (Trial Tr. I, ECF No. 7-8, PageID.830–831.) Petitioner's counsel indicated that he wished to call Ms. Broy to support a "claim that somehow the investigation was either tainted or slanted or anything was done potentially inappropriate[ly]" because of her past relationship with Petitioner. (*Id.*, PageID.831.) The prosecutor objected, arguing that such evidence was not relevant. (*Id.*, PageID.832.) The trial court indicated that it would "exclude any evidence regarding Tasha Broy—Broy's relationship with [Petitioner] at this time." (*Id.*, PageID.835.) The court did state, however, that if defense counsel wanted to raise it, counsel needed to approach in a sidebar "and tell [the court] why it's relevant to a [particular] witness' testimony." (*Id.*)

On appeal, Petitioner argued that the trial court erred by concluding that this evidence was irrelevant and, therefore, inadmissible under Michigan Rule of Evidence 402. The court of appeals disagreed, stating:

> James argues on appeal that "[a]lthough their romantic relationship had ended on bad terms," he may have believed that his prior relationship with the victim advocate meant that she would successfully exert pressure to have the charges dropped because he might have thought she still had some affection for him. Yet, he made no offer of proof in support of his contention that he did, in fact, believe such a thing. In addition, his relationship with the advocate concluded before he met Dumbuya, and although she saw him on the day of the preliminary examination, she had no contact with [James] after the examination. If, after the preliminary examination, James started telling people that the charges were going to be dropped, it could be reasonable to infer that he thought the reason was because of his relationship with the victim advocate. That did not happen, however. Instead, James began making statements that the case had been or was about to be dropped after January 24, 2018. Nothing in the record suggests that anything had changed between him and the victim advocate at that point. Rather, the main change after January 24, 2018 was that Dumbuya had been murdered and her body discarded in Kalamazoo. In light of the timing of James's statements when compared to when

the victim advocate became involved, and in light of the absence of any evidence actually showing that James believed she would or could influence the prosecutor on his behalf, we agree with the trial court that the victim advocate's testimony was speculative and irrelevant.

James also suggests that the testimony about his prior relationship with the victim advocate would have bolstered his defense theory that the Kent County prosecutors and police "prejudged" James as guilty and then tailored the evidence to fit that theory. At trial he elicited evidence suggesting a rush to judgment by the police and prosecution, but he did not argue that the victim advocate's testimony would have also advanced that theory. Further, there is nothing on the record suggesting that the victim advocate had any effect whatsoever on the murder investigation conducted by the Kalamazoo police and the Grand Rapids police, nor that she had any impact on the prosecutorial decisions associated with the murder case. James's argument on appeal that the way he treated the victim advocate may have "poisoned the well" is a bare supposition devoid of any factual support.

*James*, 2020 WL 5495286, at *10–11.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quotation marks and citations omitted). A criminal defendant, however, "does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (internal alterations and quotation marks omitted). Rather, "the Constitution permits judges to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Holmes*, 547 U.S. at 326–27 (internal alterations and quotation marks omitted). Thus, evidentiary rulings abridge the right to a meaningful opportunity to present a defense if such rulings both "infring[e] upon a weighty interest of the accused" and are "arbitrary" or "disproportionate to the purposes they are designed to serve." *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

Petitioner contends that the court of appeals erred in rejecting his claim because Ms. Broy's testimony would have been "relevant to explain statements Petitioner made expressing confidence that the pending CSC-III charges would be dismissed." (Pet'r's Br., ECF No. 2, PageID.69.) Petitioner believed that Ms. Broy could "exert influence to get the charges dismissed" because she "still had some affection for him and therefore would be willing to use any influence she might have to help him out." (*Id.*, PageID.70.) Petitioner also suggests that Ms. Broy's testimony was relevant to the defense's argument that "the Kent County detectives and prosecutors immediately prejudged [Petitioner] guilty and thereafter tailored their investigation and interpretation of the evidence to fit that narrative." (*Id.*, PageID.71.) Petitioner believes that Ms. Broy "poisoned the well" by telling officers and the prosecutors that she felt threatened by Petitioner. (*Id.*, PageID.71–72.)

Essentially, Petitioner reiterates the same arguments that he raised on direct appeal and that were rejected by the court of appeals. As an initial matter, to the extent that Petitioner asserts that the state courts erred in excluding this evidence under state law, he fails to state a claim upon which habeas relief may be granted. *See Wainwright*, 464 U.S. at 84; *Bradshaw*, 546 U.S. at 76. In any event, Petitioner fails to meet his burden of demonstrating that the evidentiary rulings excluding testimony regarding his prior relationship with Ms. Broy infringed upon his due process rights. The court of appeals properly noted that Petitioner's assertions regarding the proposed testimony were "speculative and irrelevant" and "bare supposition[s] devoid of any factual support." *James*, 2020 WL 5495286, at *10, *11. Petitioner offers no evidence from which this Court could conclude that testimony regarding his prior relationship with Ms. Broy would have definitely shown that Ms. Broy "poisoned the well" by telling officers and prosecutors about the relationship, causing them to prejudge Petitioner. Instead, a more likely explanation for

Petitioner's belief that he was prejudged was the fact that he had already been charged with CSC-III offenses regarding his conduct with Dumbuya prior to her murder.

In his reply brief, Petitioner suggests that, contrary to the court of appeals' conclusion, he had "been telling people the CSC charges would be dismissed since at least December 8, 2017, long before Ms. Dumbuya allegedly went missing and was found dead." (ECF No. 10, PageID.3583.) Petitioner argues that he "was not overly concerned with the CSC charges against him due to the guarantees he was being given by his attorney." (*Id.*) Petitioner does not explain the nature of the guarantees that his attorney provided. Even if Petitioner made such statements starting in December of 2017, he provides no support from which the Court could conclude that these statements arose from his belief that Ms. Broy would be able to exert any influence to have the charges dropped. As set forth at the evidentiary hearing, the relationship between Ms. Broy and Petitioner ended in May of 2017, well before Petitioner contends that he began making statements expressing his confidence that the CSC-III charges would be dropped. Moreover, from the Court's review of Ms. Broy's testimony, it would be a stretch to believe that she still harbored any affection for Petitioner after that time such that she would have any interest in exerting any influence to have the charges dropped. Furthermore, the testimony provided at the evidentiary hearing established that Ms. Broy had no further involvement in Petitioner's CSC-III case after the probable cause hearing held in November of 2017. Petitioner simply has provided no evidence to rebut that testimony.

As noted *supra*, trial courts have the discretion to "exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Holmes*, 547 U.S. at 326–27 (internal alterations and quotation marks omitted). Petitioner has no unfettered right to present evidence, and he has not demonstrated that the exclusion of testimony

regarding his prior relationship with Ms. Broy violated his right to present a defense. Accordingly, Petitioner cannot demonstrate that the court of appeals' rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief on habeas ground III.

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in

violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court will enter a judgment denying the petition and an order denying a certificate of appealability.

Dated:     July 29, 2024           /s/ Robert J. Jonker
                                                     Robert J. Jonker
                                                     United States District Judge